## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

JUANITA LOPEZ, Personally and as Personal Representative of the Estate of Christopher Lopez, deceased;
A.R., a minor, by and through his next friend and mother, Consuelo Romero;
C.R., a minor, by and through his next friend and mother, Consuelo Romero; and
J.R., a minor, by and through his next friend and mother, Consuelo Romero;

      Plaintiffs,

v.

DEPUTY DIRECTOR KELLIE WASKO, in her individual and official capacities;
WARDEN DAVID M. ZUPAN, in his individual and official capacities;
ASSOCIATE WARDEN RANDY LIND, in his individual and official capacities;
CAPTAIN JAMES W YATES, in his individual and official capacities;
CAPTAIN VICKY JARAMILLO, in her individual and official capacities;
LIEUTENANT GLENN K HASUI, in his individual and official capacities;
CORRECTIONAL OFFICER KRISTJAN ARING, in his individual and official capacities;
CORRECTIONAL OFFICER MATTHEW CARLINO, in his individual and official capacities;
CORRECTIONAL OFFICER THEODORE DOXTATER, in his individual and official capacities;
CORRECTIONAL OFFICER JAIME GUTIERREZ-GONZALEZ, in his individual and official capacities;
CORRECTIONAL OFFICER TAYLOR MUNSELL, in his individual and official capacities;
CORRECTIONAL OFFICER STEVE URBAN, in his individual and official capacities;
CORRECTIONAL OFFICER TIM J WILKINS, in his individual and official capacities;
CORRECTIONAL OFFICER SHANE WOLTZ, in his individual and official capacities;
CORRECTIONAL OFFICER GEORGE ROMAN, in his individual and official capacities
COUNSELOR CHERYL NEUMEISTER, in her individual and official capacities;
LOA D ROSE, R.N., in her individual and official capacities;
ERICA SISNROY, R.N., in her individual and official capacities; and
PEGGY L VILLERS, R.N., in her individual and official capacities;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their attorneys, David A. Lane and Nicole B. Godfrey of KILLMER, LANE & NEWMAN, LLP, hereby brings this Complaint and alleges as follows:

### INTRODUCTION

On March 17, 2013, in full view of most of the Defendants, a shackled and stripped Christopher Lopez died alone and ignored, on the cold concrete floor of a cell at the San Carlos Correctional Facility.  His death could have been easily prevented by most of the defendants had any one of them simply picked up a phone and called for medical help.  Instead, the Defendants, all employees of the Colorado Department of Corrections, ultimately made what could pass as a documentary film on how to ignore the obvious and serious medical needs of a dying prisoner for hours until the very last breath of life leaves his body. Christopher Lee Lopez was a thirty-five (35) year old man who suffered from schizoaffective disorder, bipolar type. On March 17, 2013, Mr. Lopez was in the custody of the Colorado Department of Corrections and confined to the San Carlos Correctional Facility ("SCCF"). At approximately 3:30 a.m. on that March morning, SCCF staff noticed that Mr. Lopez was lying face down on the floor of his cell, semi-conscious and unresponsive to staff.

Viewing his unresponsiveness as a behavioral problem, Defendants placed Mr. Lopez on special controls status, a status meant to manage prisoners engaging in violent and disruptive behavior. In accordance with special controls policy, Defendants began recording Mr. Lopez. For this reason, we now have an unassailable video record of Defendants as they forcefully entered

Mr. Lopez's cell, placed a spit mask over his head, and dragged his limp body into a restraint chair. We can watch with crystal clarity while the Defendants then shackled a dying Mr. Lopez, placing him in universal restraints with a belly chain around his waist, his wrists in handcuffs attached to the belly chain at either side of his waist, and his ankles chained together.

We can see the Defendants wheel a semi-conscious Mr. Lopez down to the intake area of the prison and eventually remove him from the restraint chair. We have a ringside seat to watch Mr. Lopez suffer two grand mal seizures in front of the camera while the Defendants idly stand about and discuss their views about Wal-Mart and other equally important topics, laughing and joking with one another, all the while completely ignoring the dying man in their charge. We watch as Defendants leave Mr. Lopez face down, still fully restrained, on the floor of the intake cell, too weak to hold his own body upright. We see Mr. Lopez struggling to breath for hours, and then, finally, we have an unobstructed view as Mr. Lopez takes his last breath, dying, half-naked on the cold concrete floor of a prison cell – isolated and alone with no Defendant caring whether he lived or died.

Defendants' willful and deliberate indifference to Mr. Lopez's medical needs directly led to his untimely, easily preventable and unjustifiable death, and Defendants should be prosecuted under Colorado law for the criminally negligent homicide of Christopher Lopez. All his mother and children can do now, however, is to file this lawsuit.

## JURISDICTION AND VENUE

1.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

3.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## PARTIES

**Plaintiffs**:

4.      At all times pertinent hereto, the decedent, Christopher Lopez, was a citizen of the United States of America and a resident of the State of Colorado confined to the Colorado Department of Corrections.

5.      At all times pertinent hereto, Plaintiff Juanita Lopez, mother of Christopher Lopez and personal representative to the Estate of Christopher Lopez, has been a citizen of the United States of America and a resident of the State of Colorado.

6.      At all times pertinent hereto, Plaintiffs Alex Romero, Christopher Romero, and Jared Romero, children of Christopher Lopez, represented here by their mother and next friend, Consuela Romero, have been citizens of the United States of America and residents of the State of Colorado.

**Defendants**:

7.      At all times relevant to the subject matter of this litigation, Defendant Kellie Wasko was a citizen of the United States and a resident of Colorado. At all relevant times,

Defendant Wasko was acting under color of state law in her capacity as Deputy Executive Director, Director of Clinical and Correctional Services of the Colorado Department of Corrections. In this capacity, Defendant Wasko had executive oversight of all functions reporting to the clinical services division at DOC. Defendant Wasko oversees the delivery of medical and mental health services to Colorado prisoners, including the development and approval of Colorado Department of Corrections' mental health policies and procedures.

8.      At all times relevant to the subject matter of this litigation, Defendant David M. Zupan was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Zupan was acting under color of state law in his capacity as a warden employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

9.      At all times relevant to the subject matter of this litigation, Defendant Randy Lind was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Lind was acting under color of state law in his capacity as associate warden employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

10.     At all times relevant to the subject matter of this litigation, Defendant James W. Yates was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Yates was acting under color of state law in his capacity as a captain employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

11.     At all times relevant to the subject matter of this litigation, Defendant Vicky Jaramillo was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Jaramillo was acting under color of state law in her capacity as a duty officer and

captain employed by the Colorado Department of Corrections at San Carlos Correctional Facility
in Pueblo, Colorado.

12.    At all times relevant to the subject matter of this litigation, Defendant Glenn K.
Hasui was a citizen of the United States and a resident of Colorado. At all relevant times,
Defendant Hasui was acting under color of state law in his capacity as a lieutenant and shift
commander employed by the Colorado Department of Corrections at San Carlos Correctional
Facility in Pueblo, Colorado.

13.    At all times relevant to the subject matter of this litigation, Defendant Kristjan
Aring was a citizen of the United States and a resident of Colorado. At all relevant times,
Defendant Aring was acting under color of state law in his capacity as a correctional officer
employed by the Colorado Department of Corrections at San Carlos Correctional Facility in
Pueblo, Colorado.

14.    At all times relevant to the subject matter of this litigation, Defendant Matthew
Carlino was a citizen of the United States and a resident of Colorado. At all relevant times,
Defendant Carlino was acting under color of state law in his capacity as a correctional officer
employed by the Colorado Department of Corrections at San Carlos Correctional Facility in
Pueblo, Colorado.

15.    At all times relevant to the subject matter of this litigation, Defendant Theodore
Doxtater was a citizen of the United States and a resident of Colorado. At all relevant times,
Defendant Doxtater was acting under color of state law in his capacity as a correctional officer
employed by the Colorado Department of Corrections at San Carlos Correctional Facility in
Pueblo, Colorado.

16.     At all times relevant to the subject matter of this litigation, Defendant Jaime Gutierrez-Gonzalez was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Gutierrez-Gonzalez was acting under color of state law in his capacity as a correctional officer employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

17.     At all times relevant to the subject matter of this litigation, Defendant Taylor Munsell was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Munsell was acting under color of state law in his capacity as a correctional officer employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

18.     At all times relevant to the subject matter of this litigation, Defendant Steve Urban was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Urban was acting under color of state law in his capacity as a correctional officer employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

19.     At all times relevant to the subject matter of this litigation, Defendant Tim J. Wilkins was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Wilkins was acting under color of state law in his capacity as a correctional officer employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

20.     At all times relevant to the subject matter of this litigation, Defendant Shane Woltz was a citizen of the United States and a resident of Colorado. At all relevant times,

Defendant Woltz was acting under color of state law in his capacity as a correctional officer employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

21.     At all times relevant to the subject matter of this litigation, Defendant George Roger Roman was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Roman was acting under color of state law in his capacity as a correctional officer employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

22.     At all times relevant to the subject matter of this litigation, Defendant Cheryl Neumeister was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Neumeister was acting under color of state law in her capacity as a mental health clinician employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado. For her actions as outlined in this complaint, the Colorado Department of Corrections terminated Defendant Neumeister's employment.

23.     At all times relevant to the subject matter of this litigation, Defendant Loa D. Rose was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Rose was acting under color of state law in her capacity as a nurse employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado. For her actions as outlined in this complaint, the Colorado Department of Corrections terminated Defendant Rose.

24.     At all times relevant to the subject matter of this litigation, Defendant Erica Sisnroy was a citizen of the United States and a resident of Colorado. At all relevant times,

Defendant Sisnroy was acting under color of state law in her capacity as a nurse employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado.

25.    At all times relevant to the subject matter of this litigation, Defendant Peggy L. Villers was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Villers was acting under color of state law in her capacity as a nurse employed by the Colorado Department of Corrections at San Carlos Correctional Facility in Pueblo, Colorado. For her actions as outlined in this complaint, the Colorado Department of Corrections terminated Defendant Villers.

## FACTUAL ALLEGATIONS

### *Mr. Lopez's Background and History of Mental Illness*

26.    Christopher Lee Lopez was born on July 5, 1977 in Portland, Oregon, the second son to Juanita and Mike Lopez.

27.    When Mr. Lopez was nine years old, his father, Mike, tragically died of cancer.

28.    After his father's death, Mr. Lopez's childhood was turbulent and chaotic. Mr. Lopez often witnessed his mother's boyfriends physically abusing her, finding little choice but to step in to protect his mother, frequently at great cost to his own safety and welfare.

29.    Mr. Lopez dropped out of school in the seventh grade, and he left home at the age of 15.

30.    Throughout his late-teens and early twenties, Mr. Lopez was incarcerated for a series of minor offenses which included theft and engaging in a riot.

31.     In 2005, while incarcerated in the Weld County Jail, Alice McPherson, a Licensed

Professional Counselor, diagnosed Mr. Lopez with schizophrenia. Ms. McPherson noted that Mr.

Lopez experienced "paranoid delusions, auditory and visual hallucinations and believes he is

Jesus Christ."

32.     Upon information and belief, over the next eight years, Mr. Lopez suffered

through more than a dozen psychotic episodes, finding himself involuntarily committed to the

Colorado Mental Health Institute at Pueblo (CMHIP) twelve times.

33.     On September 19, 2006, Mr. Lopez entered the Colorado Department of

Corrections (CDOC) to serve a two (2) year sentence for trespassing.

34.     Less than a year later, Mr. Lopez found himself facing new charges for assault for

allegedly kicking a correctional officer in the groin on July 18, 2007. Upon information and

belief, Mr. Lopez was suffering a psychotic break at the time of the alleged assault and his

actions were symptomatic of his mental illness.

35.     Not long after the alleged assault, CDOC committed Mr. Lopez to CMHIP. Mr.

Lopez was released directly from CMHIP on February 12, 2008.

36.     Mr. Lopez returned to CDOC custody on July 12, 2010 to serve a four (4) year

sentence for the July 18, 2007 assault.

37.     Over the next six months, Mr. Lopez's mental health rapidly deteriorated. By

February 2011, Mr. Lopez was experiencing such frequent and vivid hallucinations and

delusions that mental health staff at Limon Correctional Facility (LCF) requested a referral back

to CMHIP.

38.    Mr. Lopez was admitted back in CMHIP on March 3, 2011. CMHIP discharched

Mr. Lopez back to CDOC custody on March 31, 2011.

*San Carlos Correctional Facility*

39.    On April 11, 2011, Mr. Lopez arrived at San Carlos Correctional Facility (SCCF).

40.    SCCF is supposed to be a prison with a treatment program for Colorado prisoners

who suffer from mental illness.

41.    On information and belief, the majority of the SCCF prisoner population suffers

from serious mental illness.

42.    On information and belief, SCCF correctional, mental health, and medical staff

are trained to collaborate to help mentally ill prisoners stabilize their mental illness.

43.    All SCCF employees have a dual mission of providing mental health treatment as

well as maintaining the safety and security of the prison population.

44.    Immediately upon his arrival at SCCF, Mr. Lopez complained of hearing voices.

When the voices in Mr. Lopez's head told him that a certain correctional officer was going to

hurt him, Mr. Lopez felt he needed to protect himself, and kicked the officer in the groin area.

45.    Rather than treat Mr. Lopez's symptoms of mental illness, SCCF officials further

punished Mr. Lopez by placing him in administrative segregation, or solitary confinement, and

pressing further criminal charges against him.

*The Deterioration of Mr. Lopez's Mental Health in Solitary Confinement*

46.    On May 10, 2011, Mr. Lopez was placed in solitary confinement at SCCF. Seven

days later, SCCF staff requested that Mr. Lopez be transferred to Colorado State Penitentiary

(CSP).

47.    CSP is the state of Colorado's supermax prison, where all prisoners are isolated in

their cells 22-24 hours/day with little access to human contact and no access to outdoor exercise.

48.    It is well-known that the placement of mentally ill prisoners in solitary

confinement, particularly prisoners with psychotic disorders like schizophrenia, exacerbates their

mental illness. Nevertheless, SCCF officials were eager to pawn Mr. Lopez off to CSP rather

than provide him adequate mental health treatment in the state's only prison specifically meant to

treat the severely mentally ill.

49.    On information and belief, SCCF officials wanted to punish Mr. Lopez for

kicking a correctional officer and were not interested in finding an appropriate treatment plan for

Mr. Lopez's severe mental illness.

50.    When Mr. Lopez was not immediately approved for transfer to CSP by CDOC

officials, SCCF mental health staff again requested that Mr. Lopez be moved to CSP on June 7,

2011.

51.    On June 10, 2011, Mr. Lopez met with LPC Maria Robinson at SCCF. During

this meeting, Mr. Lopez spoke of voices telling him that someone at SCCF wants to put him to

death. LPC Robinson also recorded the following about her June 10, 2011 encounter with Mr.

Lopez:

> [Mr. Lopez] spoke about other things which were somewhat incomprehensible. He
> said about six years ago he met a girl who said she was a mediator and that the book
> of Romans says people were change [sic] into corruptible man, instead of what they
> were supposed to be. Instead of wanting to be under the Creator they exchanged

what they were supposed to be for corruptible man. [Mr. Lopez] said, "I have angel as a mediator. Angels mediate between people and aliens so humans are like aliens." [Mr. Lopez] said, "I have been through so many things[.]"[] [Mr. Lopez] said, ["]I am still trying to get myself together from being sawed in half and having my head cut-off, in the spirit."

52.    Despite clearly evident delusions and paranoia, LPC Robinson concluded that Mr. Lopez "should be discharged out of SCCF because he [did] not [] present with acute psychiatric issues."

53.    By July 5, 2011, CDOC officials had transferred Mr. Lopez to CSP.

54.    While at CSP, CSP officials placed Mr. Lopez in the Offenders with Mental Illness (OMI) program. The OMI program was meant to manage prisoners with mental illness and developmental disabilities. Upon information and belief, CDOC staff members consider the OMI program to have been a failure and discontinued its use in early 2013.

55.    Predictably, Mr. Lopez's mental health continued to rapidly deteriorate while isolated at CSP. Less than 10 months after his transfer, CSP officials referred him back to SCCF.

56.    On April 30, 2012, LPC D. Mathes met with Mr. Lopez and noted that his mental state was "deteriorating" as he appeared withdrawn and continued to isolate himself from others. LPC Mathes also noted that Mr. Lopez was having "visions" of God and "others" that instructed him not to talk too much. LPC Mathes recorded that "[CSP staff] report [that Mr. Lopez] has been acting odd, turning his TV up when asked to reduce the volume, and ignoring officers when they say hello or ask what he's doing. [CSP staff] report [that Mr. Lopez] appears withdrawn and will sometimes sit on his bunk for long period of time staring at the wall."

57.    LPC Mathes ultimately concluded that Mr. Lopez was "struggling with delusional thinking and [having] difficulty separating fantasy from reality." For these reasons, LPC Mathes completed a Special Need Unit (SNU) referral to SCCF.

58.    CDOC officials transferred Mr. Lopez back to SCCF on May 31, 2012, where SCCF officials refused to place him in the SNU. Instead, Mr. Lopez remained in solitary confinement, on administrative segregation status, for the next nine and a half months. SCCF mental health records reveal that Mr. Lopez's mental status continued to deteriorate.

59.    On June 4, 2012, LPC Dana Krakow noted that Mr. Lopez continued to be withdrawn and would "sometimes sit on his bunk for long period of time staring at the wall." LPC Krakow also concluded that Mr. Lopez appeared to be struggling with delusional thinking and with separating fantasy from reality.

60.    On October 4, 2012, Dr. Jamie Koprivnikar initiated an involuntary medication hearing to allow SCCF officials to administer antipsychotic medication to Mr. Lopez whenever he refused to take the medication on his own. On November 6, 2012, the involuntary medication hearing was held, and the panel of mental health professionals unanimously approved the administration of involuntary medication on Mr. Lopez for 180 days.

61.    Over the next several months, Mr. Lopez was placed on frequent mental health watches due to increasing suicidal thoughts. Mr. Lopez was placed on a mental health watch from October 2, 2012 to October 4, 2012, from December 13, 2012 to December 16, 2012, from January 9, 2013 to January 11, 2013, and from January 23, 2013 to January 27, 2013.

62.     On February 14, 2013, Dr. Koprivnikar noted that Mr. Lopez "appear[ed] overmedicated and ha[d] chronic [suicidal ideation]." Dr. Koprivnikar decided that she would begin tapering the Depakote and Risperdal administered to Mr. Lopez and would add Lithium.

63.     Despite Mr. Lopez's continuing mental health crises, he remained compliant with his psychotropic medications during the months of January and February 2013.

64.     As an apparent reward for this good behavior, Mr. Lopez was moved out of solitary confinement to a "close custody" cell on March 15, 2013. CDOC viewed this movement as a "progression" and purported to base it on his lack of disciplinary incidents since November 2012.

65.     Mr. Lopez's change in custody status was only a change on paper. On information and belief, Mr. Lopez moved to a new solitary cell, where he was confined alone for 22-24 hours each day.

66.     Mr. Lopez did not display any negative behaviors on March 15 or 16, 2013.

**The Events Surrounding Mr. Lopez's Death on March 17, 2013**

67.     On March 17, 2013, at approximately 3:30 a.m., CDOC staff members first noticed Mr. Lopez lying on his stomach on the floor of his cell, partially clothed, with his face on the floor and his lower body slightly under the edge of the bed in his cell. Mr. Lopez's arms were under his chest, as is depicted in the following photograph from the video of Mr. Lopez's final hours:



68.    While lying on the floor of his cell, Mr. Lopez was visibly shaking.

69.    CDOC sent Defendant Jaime Gutierrez-Gonzalez, a correctional officer, to Mr.

Lopez's cell to investigate why Mr. Lopez was lying on the floor. Defendant Theodore Doxtater,

another correctional officer, accompanied Defendant Gonzalez with a video camera, which he

used to begin recording the final hours of Mr. Lopez's life.

70.    When he arrived at Mr. Lopez's cell, Defendant Gonzalez ordered Mr. Lopez to

"come to the door." Mr. Gonzalez opened up the food tray slot in the middle of Mr. Lopez's cell

door. The food tray slot is approximately twelve inches high and eighteen inches wide.

Defendant Gonzalez, speaking to Mr. Lopez through the food tray slot, then requested that Mr.

Lopez look up at the door.

71.     Mr. Lopez attempted to raise his head and scoot his body toward the door. Physically unable to move, Mr. Lopez lifted his head up and down in an attempt to communicate with Defendant Gonzalez, but Mr. Lopez could not speak.

72.     Defendant Gonzalez told Mr. Lopez that he needed "to show cooperation" so Defendant Gonzalez could help Mr. Lopez. Defendant Gonzalez asked Mr. Lopez to lift his head. Mr. Lopez did so, and Defendant Gonzalez said to him, "There you go."

73.     After approximately ten minutes of requesting that Mr. Lopez come to the door, Defendant Gonzalez moved away from Mr. Lopez's door, telling Defendant Doxtater, "He wants to respond, but can't."

74.     Defendant Gonzalez then told Mr. Lopez that CDOC staff are "suiting up the team" to extract him from his cell. In a key moment of the video, Defendant Gonzalez stated, "**We understand you are having a medical condition**, but you have to work with me. . . Lift your head if you understand what I am telling you."

75.     Mr. Lopez attempted to lift his head. Defendant Gonzales then said, "That was a pretty good response, so **come to the door so we can give you the medical treatment you need**."

76.     Mr. Lopez was still unable to move toward the door, so Defendant Gonzales shut and locked the food tray door, leaving Mr. Lopez's cell-front.

77.     On information and belief, Defendant Gonzales then contacted Defendant Hasui, the Shift Commander for the March 17, 2013 graveyard shift.

78.     Defendant Hasui arrived at Mr. Lopez's cell at approximately 3:45 a.m. Like Defendant Gonzalez, Defendant Hasui attempted to get Mr. Lopez to come to his cell door to

"cuff up," or to place his hands through his cell's food tray slot so that the correctional officers could place him in handcuffs.

79.  Mr. Lopez was too sick to respond to Defendant Hasui's orders to "cuff up."

80.  Upon information and belief, at no point did Defendants Hasui, Gonzalez, or Doxtater initiate a medical intervention on behalf of Mr. Lopez, who was clearly in medical distress.

81.  At approximately 3:55 a.m., Defendant Hasui called Defendant Jaramillo, SCCF's Duty Officer, to obtain permission to forcibly extract Mr. Lopez and place him on special controls status.

82.  Special controls status is a heightened security status for prisoners who have been deemed in need of heightened physical control. Per written policy, CDOC Administrative Regulation 300-56, *Special Controls,* special controls status is meant to be used only to house prisoners who have become violent or destructive to themselves and others.

83.  Mr. Lopez was not displaying any behaviors that would support his placement on special controls. He was not violent or destructive to himself or others.

84.  Upon information and belief, Defendants Wasko, Lind, and Zupan were responsible for the development and implementation of the special controls policy at SCCF. Upon information and belief, Defendants Wasko, Lind, and Zupan were also responsible for training SCCF staff on the use of special controls, particularly with regard to its use on mentally ill prisoners.

85.  On information and belief, Defendants Wasko, Lind, and Zupan specifically authorized and allowed the use of special controls on prisoners at SCCF, even when those

prisoners were not displaying violent or destructive behavior. Defendants Wasko, Lind, and Zupan created a culture within SCCF where CDOC staff members used special controls to punish mentally ill prisoners for behavior symptomatic of the prisoners' mental illnesses.

86.     When a prisoner is placed on special controls status, CDOC written policy requires correctional staff to arrange for a mental health clinician to perform a mental health assessment of the prisoner, to ensure that the prisoner should not instead be placed on a "Mental Health Watch."

87.     If a mental health clinician determines that a prisoner needs to be placed on a Mental Health Watch, the prisoner is supposed to be removed from special controls status. The order to place a prisoner on mental health watch is meant to trump any order placing a prisoner on special controls.

88.     Upon information and belief, in practice, the mental health needs of prisoners like Mr. Lopez rarely trumped an order placing a prisoner on special controls.

89.     Nursing staff and mental health clinicians are in the Clinical Services chain of command at CDOC; they ultimately report to the Director of Clinical Services. Defendants Neumeister, Villers, Rose, and Sisnroy, as nursing staff and mental health clinicians at SCCF, reported to Defendant Wasko on March 17, 2013.

90.     Correctional officers are in the correctional chain of command at CDOC; they ultimately report to the Warden and Associate Warden of each facility. Defendants Aring, Carlino, Doxtater, Gonzalez, Hasui, Jaramillo, Munsell, Roman, Urban, Wilkins, Woltz, and Yates, as correctional officers at SCCF, reported to Defendants Zupan and Lind on March 17, 2013.

91. On March 17, 2013, Defendants Hasui and Defendant Jaramillo determined that "another attempt to get [Mr. Lopez] to comply" was necessary before placing Mr. Lopez on special controls due to inadequate staffing levels at the prison.

92. Mr. Lopez was near death and could not comply.

93. Defendant Jaramillo approved the request to initiate a force cell extraction pursuant to the special controls procedure. Defendant Hasui's official reason for the extraction was "[t]o check [Mr. Lopez's] medical condition." This is not an appropriate reason to place a prisoner on special controls according to CDOC policy.

94. However, in the "Use of Force" report completed by Defendant Hasui, he also indicated that Mr. Lopez was being "psychologically intimidating" because of Mr. Lopez's "unknown intentions for refusal of orders and past SCCF history," that Mr. Lopez was verbally non-complaint because he "would not comply with numerous orders to come to the door and cuff up," and that Mr. Lopez engaged in "passive resistance" because he "refused to acknowledge staff directives and would only lay on the floor." None of the reasons listed by Defendant Hasui indicated that Mr. Lopez was engaging in violent or destructive behavior.

95. At approximately 4:45 a.m., Defendant Hasui gathered the force cell team together, including Defendant Carlino, Defendant Munsell, Defendant Gonzales, Defendant Aring, Defendant Woltz, and Defendant Doxtater (collectively, the "Force Cell Extraction Defendants").

96. During the initial force cell briefing, Defendant Hasui explained that Mr. Lopez was "exhibiting an inability, possibly medical, to cuff up." Defendant Hasui recognized that Mr. Lopez attempted to try to come to his cell door, but had "not fully complied" with the order.

Defendant Hasui explained that because SCCF was short-staffed on the early morning of March 17, 2013, the Force Cell Extraction Defendants would not be using oleoresin capsicum (OC), or pepper spray, during the extraction.

97.     On information and belief, Defendants Hasui and Jaramillo only determined that it was unnecessary to use pepper spray on Mr. Lopez because of the shortage of available staff. Otherwise, the dying Christopher Lopez likely would have been pepper sprayed. Defendants Hasui and Jaramillo did not consider that the use of OC spray was unnecessary because Mr. Lopez was dying and unable to move on his own.

98.     At approximately 4:50 a.m., the Force Cell Extraction Defendants arrived at Mr. Lopez's cell. Defendant Aring and Defendant Hasui ordered Mr. Lopez to "cuff up" three more times.

99.     Mr. Lopez, still lying in the same position on the floor of his cell, clearly unable to move, could not respond to Defendants' commands.

100.    At approximately 4:55 a.m., the Force Cell Extraction Defendants entered Mr. Lopez's cell. Defendant Carlino entered Mr. Lopez's cell first and placed Mr. Lopez's head in a spit hood. There was no reason to use a spit hood on Mr. Lopez because Mr. Lopez was not spitting, acting violently or disruptively, nor was he engaging in any self-harming behaviors.

101.    Defendants Gonzales, Woltz, Munsell, and Aring followed Defendant Carlino, using "strength" techniques to control and immobilize the already immobile Mr. Lopez. There was no reason to use "strength" techniques to control and immobilize Mr. Lopez because Mr. Lopez was so near death that he was not acting violently or disruptively, nor was he engaging in any self-harming behaviors.

102.    Defendant Doxtater recorded the entire force cell extraction. At no point did Defendant Doxtater take any reasonable steps to initiate a medical intervention on behalf of Mr. Lopez.

103.    Throughout the extraction, Mr. Lopez was barely conscious if he was conscious at all. Mr. Lopez did not resist the Defendants' attempts to restrain and control him. Mr. Lopez could not have resisted even if he had tried to do so because he was so sick, weak, and near death.

104.    Once Defendants Gonzales, Woltz, Munsell, Aring, and Carlino removed Mr. Lopez from his cell, they placed him in universal restraints, with wrists in handcuffs attached to a stomach chain and ankles chained together, and tied him to a restraint chair.

105.    There was no reason to place Mr. Lopez in universal restraints or a restraint chair because Mr. Lopez was not acting violently or disruptively nor was he engaging in any self-harming behaviors.

106.    Once in the restraint chair, Defendant Rose was supposed to provide a full medical examination of Mr. Lopez. It is readily apparent from the video tape that even to an untrained eye, Mr. Lopez was in *extremis* and was in dire need of medical intervention.

107.    Instead of providing a medical exam, however, Defendant Rose just took Mr. Lopez's blood pressure. Defendant Rose then reported to Defendant Hasui and the other Force Cell Extraction Defendants that Mr. Lopez's pulse looked "good," but that he was hyperventilating.

108.    Upon information and belief, Mr. Lopez's vital signs were abnormal at the time of his cell extraction. Despite this, Defendant Rose failed to initiate appropriate medical intervention for Mr. Lopez.

109.    Defendant Rose failed to make any attempt to speak to Mr. Lopez.

110.    Defendant Rose failed to perform a full and appropriate nursing assessment of Mr. Lopez.

111.    Defendant Rose failed to record Mr. Lopez's obvious need for medical intervention. The entirety of Defendant Rose's report of Mr. Lopez's cell extraction is as follows: "At approximately 0500 on 3/17/13, Offender Lopez, Christopher #89970 was forcefully removed from Cell D 24 on 4 Right. Medical assessment completed. Anatomical completed. Shift commander present."

112.    Upon information and belief, Defendant Rose's failure to initiate medical intervention for Mr. Lopez was a contributing factor in his death.

113.    Upon information and belief, Defendants Hasui and the other Force Cell Extraction Defendants knew that Defendant Rose did not perform a full medical examination on Mr. Lopez, yet did nothing to ensure that Mr. Lopez received the immediate medical attention he so desperately needed.

114.    Throughout this brief encounter with Defendant Rose, Mr. Lopez could not stand on his own two feet, and he was held up by some combination of the Force Cell Extraction Defendants.

115.    At the time of his extraction from his cell, Mr. Lopez's body was limp, and he was only semi-conscious, in clear medical distress. Mr. Lopez's breathing was distinctly and

audibly at an elevated rate, his nose was bleeding, he had a large hematoma with bruising on his forehead, he had bruising on his arms and back, and he had urinated on himself. Despite this, none of the Defendants took the time to fully examine Mr. Lopez once he was out of his cell, none of the Defendants sent him to medical for a full examination, and none of the Defendants contacted a medical doctor on behalf of Mr. Lopez.

116.    Defendant Aring pushed Mr. Lopez shackled in the restraint chair to the intake area of the prison.

117.    Upon arrival in the intake area, Mr. Lopez was then strip searched per special controls policy.

118.    During the strip search, Mr. Lopez was too weak to hold himself up. Mr. Lopez's body was limp, and he remained in clear medical distress. Despite this, none of the Force Cell Extraction Defendants took any steps to get Mr. Lopez the medical attention he so obviously needed.

119.    Instead, after the strip search, the Force Cell Extraction Defendants attempted to sit Mr. Lopez down on the bench in the intake cell. Mr. Lopez was unable to hold himself up, and he started to fall off the bench. The Force Cell Extraction Defendants caught him as he was falling and again tried to prop him up on the bench.

120.    For less than one minute, the Force Cell Extraction Defendants left Mr. Lopez hunched over on the bench. At this point, Mr. Lopez's breathing was very labored, and he remained in obvious medical distress.

121.    When Defendant Hasui and the Force Cell Extraction Defendants realize that Mr. Lopez would not be able to hold himself up, they collectively decide to place him back in the

restraint chair because, as Defendant Hasui reported, "he seemed unable/unwilling to sit upright

and appeared to possibly harm himself by falling."

122.    Defendant Jaramillo approved the decision to leave Mr. Lopez in the restraint

chair.

123.    Despite the clear recognition that Mr. Lopez was unable to hold himself upright,

Defendant Jaramillo, Defendant Hasui, and the Force Cell Extraction Defendants took no steps

to make sure that Mr. Lopez received prompt and adequate medical attention.

124.    Instead, at approximately 5:25 a.m., Defendants Jaramillo, Hasui, Rose, Aring,

Carlino, Doxtater, Gonzalez, Munsell and Woltz ignored their duty of care for their prisoner and

left Mr. Lopez to slowly die in that intake cell.

125.    Upon information and belief, the failure of Defendants Jaramillo, Hasui, Rose,

Aring, Carlino, Doxtater, Gonzalez, Munsell and Woltz to initiate medical intervention on behalf

of Mr. Lopez was a contributing factor to his death.

126.    Defendant Doxtater left the video camera running on a tripod outside of the intake

cell where the Force Cell Defendants placed Mr. Lopez. Over the next several hours, that video

camera would record the final moments of Mr. Lopez's life.

127.    After Mr. Lopez was placed in the intake cell, Defendant Hasui called Defendant

Jaramillo and informed her that he and the other Force Cell Defendants had left Mr. Lopez in the

restraint chair because he "kept falling forward" when he was not strapped to the chair. When

Defendant Hasui asked Defendant Jaramillo if that was okay, Defendant Jaramillo said it "was

okay, but [Defendant Hasui] needed to remove him and place him on the floor up against the

cement slab." Defendant Jaramillo took no steps to ensure that Mr. Lopez received any medical attention, despite the obvious indications that he was in severe medical distress.

128.    At approximately 5:40 a.m., Defendant Roman relieved the Force Cell Team Defendants in the intake area.

129.    At approximately 5:56 a.m., Defendant Nurse Sisnroy looked in on Mr. Lopez. Defendant Sisnroy did not enter the intake cell to examine Mr. Lopez. Defendant Sisnroy did not take Mr. Lopez's vital signs, she did not perform a nursing assessment of Mr. Lopez, and she did not initiate appropriate medical intervention on Mr. Lopez's behalf. Instead, Defendant Sisnroy, like the Force Cell Defendants before her, left a limp, semi-conscious Mr. Lopez to die.

130.    At approximately 6:12 a.m., Defendant Yates took over as Shift Commander for Defendant Hasui. Defendant Yates officially assigned Defendant Roman as the posted staff member at the intake cell occupied by Mr. Lopez. Defendant Yates tasked Defendant Roman with "constantly monitor[ing]" Mr. Lopez.

131.    At some point after Mr. Lopez was left alone in the restraint chair in the intake cell, he had a grand mal seizure, as depicted in the following still shot from the video of Mr. Lopez's last hours of life:



132.    Mr. Lopez's legs shook at the start of the seizure, causing the chains to hit the steel footrest of the restraint chair. When his legs stopped shaking, Mr. Lopez's eyes rolled back in his head, his body churned against the restraints, and his upper body turned red. At the end of the seizure, Mr. Lopez slumped over on his right side. Mr. Lopez began to engage in postictal snoring, a type of loud snoring that follows a seizure, for approximately fifteen minutes.

133.    Despite the noise caused by Mr. Lopez's shackles banging against the steel footrest of the restraint chair and by the loud snoring, no one came to check on Mr. Lopez's well-being.

134.    After the seizure, Mr. Lopez fell sideways, hunched over in the restraint chair, as depicted in the following still shot from the video of the final hours of Mr. Lopez's life:



135.    Defendant Roman failed to constantly monitor Mr. Lopez, and he failed to
respond when Mr. Lopez suffered an obvious grand mal seizure.

136.    At approximately 6:25 a.m., Defendants Yates, Roman, and Wilkins went to
speak with Mr. Lopez, who was still hunched over in the restraint chair. Mr. Lopez was unable to
respond to Defendant Yates' orders to respond to staff. Defendant Yates noted that Mr. Lopez
"was not displaying any type of negative behavior – other than refusing to respond verbal[ly] to
staff."

137.    Defendants Roman, Wilkins, and Yates removed Mr. Lopez from the restraint
chair and placed him on the floor of the intake cell. As Defendants Roman, Wilkins, and Yates
removed Mr. Lopez from the restraint chair, he was unable to hold himself up and required the

assistance of all three Defendant correctional officers to rise from the restraint chair, as depicted

in the following still shot from the video of the final hours of Mr. Lopez's life:



138.    Defendant Roman removed the spit hood from Mr. Lopez's head. After

Defendants Roman, Wilkins, and Yates placed Mr. Lopez on the floor, Mr. Lopez, still shackled

in ankle restraints and handcuffs attached to a belly chain, rolled over onto his stomach, into

what is known as the prone position, as shown in the following still shot from the video

recording the final hours of Mr. Lopez's life:

29



139.    The prone position is a body position in which one lies with the chest down and
back up. A shackled prisoner in the prone position is vulnerable to having positional
asphyxiation.

140.    On information and belief, Defendants Roman, Wilkins, and Yates were trained
that prisoners shackled in universal restraints should never be left in the prone position. Despite
this training, Defendants Roman, Wilkins, and Yates left the limp, unconscious Mr. Lopez lying
face down on the floor of the intake cell to die.

141.    On information and belief, as Defendant Yates was leaving the intake area, he
said to Defendant Roman, "Alright man, holler if anything changes." Defendant Roman
responded, "Like if he stops breathing?"

142.    Meanwhile, in the intake cell, it was becoming increasingly difficult for Mr. Lopez to breathe. Mr. Lopez began intermittently groaning and arching his back as his breathing became more labored.

143.    Upon information and belief, Defendants Roman, Wilkins, and Urban were standing outside the intake cell as Mr. Lopez's breathing became more sporadic. No one did anything to assist Mr. Lopez or to get him the medical attention he so desperately needed.

144.    As the videotape documents in excruciating detail, it was obvious to anyone observing Mr. Lopez that he was having trouble breathing and needed prompt medical attention.

145.    At approximately 7:30 a.m., Defendant Villers arrived in the intake area to give Mr. Lopez his psychotropic medications. Defendant Villers opened the food tray slot on the door to the intake cell and spoke to Mr. Lopez. Mr. Lopez, lying limp and face down on the floor of the cell, could not respond. At the time Defendant Villers was speaking to him, Mr. Lopez was rapidly breathing, and his legs were shaking.

146.    At approximately 7:40 a.m., Defendant Yates contacted Defendant Neumeister, the on-call mental health clinician. Defendant Yates requested that Defendant Neumeister come to the facility to do a mental health check on Mr. Lopez. Defendant Yates told Defendant Neumeister, "I mean, he's not doing anything, but still displaying the same behavior, he won't talk, he won't respond, he's just lying there[,] breathing. I wanted to make contact with you to assess this guy, see if you know what is going on with him. He doesn't want to listen to me."

147.    Defendant Neumeister was transferred to SCCF in January 2013 from La Vista Correctional Facility. Defendant Neumeister's transfer, which was effectuated by Defendant Wasko, was part of a series of disciplinary actions taken against Defendant Neumeister in 2012

and early 2013. Upon information and belief, Defendant Neumeister was not happy about her transfer to SCCF because she did not like the prisoners confined there, finding them difficult to work with because of their severe mental illnesses.

148.    In February 2013, Defendant Neumeister participated in a full-day Cardiopulmonary Resuscitation (CPR) course as part of her employment at SCCF. This CPR training teaches participants to identify a meaningful rise and fall of the chest for thirty to sixty seconds to determine whether a person is breathing. If meaningful breaths are not observed, then the CPR training directs trainees to initiate CPR.

149.    On information and belief, each of the Defendants to this action received the same or similar CPR training as Defendant Neumeister as part of their employment with CDOC.

150.    On February 15, 2013, Tammy LaBorde, Health Professional V at SCCF, issued a Confirming Memorandum to all mental health staff at SCCF, including Defendant Neumeister. In response to a backlog of improperly documented mental health watch assessments, Ms. LaBorde issued the memorandum to remind mental health staff, including Defendant Neumeister, to timely and completely document all mental health watch assessments.

151.    One of the duties of mental health clinicians like Defendant Neumeister is to perform mental health evaluations of prisoners like Mr. Lopez to determine whether a particular prisoner is an imminent harm to himself or others. If the clinician determines that a prisoner poses an imminent danger, he or she will immediately place the prisoner on a mental health watch.

152.    CDOC Administrative Regulation 700-29, *Mental Health Watches*, requires that mental health clinicians like Ms. Neumeister conduct mental health assessments within one hour

of contact by the Shift Commander. AR 700-29 states in pertinent part: "A mental health

clinician will provide an assessment to determine the necessity for a mental health watch within

one hour of contact by the Shift Commander. After hours, the mental health on-call clinician will

come to the facility to provide the required evaluation."

153.     If a prisoner requires a mental health assessment during a graveyard shift, CDOC

*Clinical Standard and Procedure for Mental Health: Mental Health On-Call*, requires that the

on-call clinician respond by telephone to emergencies within fifteen (15) minutes of receiving a

call from a facility's Shift Commander and that the on-call clinician arrive on-site at the prison

within approximately one hour of receiving a call.

154.     AR 700-29 IV(G) requires that a clinician performing a mental health evaluation

do the following: (1) An on-site, face-to-face evaluation by a mental health clinician; (2) A

review of the prisoner's mental health and medical records; (3) Discussion with CDOC

correctional officer or contract workers regarding the prisoner's recent behavior and security

management needs; (4) An evaluation of the prisoner's current suicide plan, intent, means and

other indicators of risk of self-injurious behavior; (5) An evaluation of current and historical

psychiatric disturbance; and (6) Completion of the "DOC Self-Injury Risk Assessment,"

(Attachment A to AR 700-29).

155.     During their telephone conversation on the morning of March 17, 2013,

Defendant Neumeister told Defendant Yates that she would plan to arrive at SCCF by 9:00 a.m.,

contrary to CDOC policy, which requires that on-call mental health clinicians arrive on-site

within an hour of contact. Defendant Yates approved of Defendant Neumeister's deviation from

policy, despite that he had no authority to do so.

156. After attempting to speak to Mr. Lopez, Defendant Villers went to the medical area of SCCF to get syringes to administer Mr. Lopez's psychotropic medications. While waiting for Defendant Villers to return, Defendants Urban, Wilkins, and Roman stood outside Mr. Lopez's intake cell joking about Mr. Lopez's current plight. Defendants Urban, Wilkins, and Roman mocked Mr. Lopez's "civil[] disobedience" and chided that they "guess[ed] he didn't like the treatment he was getting up there [in his cell], huh?"

157. When Defendant Villers returned with Mr. Lopez's psychotropic medications, she, too, joked with Defendants Urban, Wilkins, and Roman about giving Mr. Lopez too much, saying, "Here, I'll give him this much." Defendants Urban, Wilkins, Roman, and Villers laughed at the prospect of Mr. Lopez overdosing on his psychotropic medications.

158. At approximately 7:50 a.m., Defendants Urban, Wilkins, and Roman entered the intake cell where Mr. Lopez was lying on the floor, struggling to breathe. After Defendants Urban, Wilkins, and Roman held down the semi-conscious Mr. Lopez, Defendant Villers entered the cell, kicking at Mr. Lopez's shackled feet with her right foot, as depicted in the following still shot from the video recording the final hours of Mr. Lopez's life:



159.    Defendant Villers then injected Mr. Lopez with psychotropic drugs, 5 mg of

Haldol and 1 mg of Cogentin in his left buttock. She undertook no actions to determine the cause

of Mr. Lopez's obvious, serious medical condition or took any steps to obtain medical

intervention necessary to save his life.

160.    After administering Mr. Lopez's medication, Defendant Villers tugged on the

right and left side of the belly chain restraining Mr. Lopez. Without saying a word to Mr. Lopez,

Defendant Villers exited the intake cell.

161.    Despite Mr. Lopez's clear distress and labored breathing, Defendant Villers did

not take his vital signs or otherwise perform any sort of medical assessment of Mr. Lopez.

162.     Upon information and belief, Defendant Villers failure to initiate medical intervention for Mr. Lopez was a contributing factor to his death.

163.     Despite Mr. Lopez's clear distress and labored breathing, Defendants Roman, Urban, and Wilkins also failed to initiate a medical intervention for Mr. Lopez.

164.     Instead, Defendants Roman, Urban, Wilkins, and Villers left a weak, unresponsive, and obviously critically ill prisoner lying face down on the intake cell floor to die.

165.     Just prior to 9:00 a.m., Mr. Lopez had another grand mal seizure in the intake cell. Mr. Lopez's torso and legs shook uncontrollably for several minutes, and he began noisily breathing through his breathing through his nose at a fast pace, or stridor breathing. Stridor breathing occurs when a person's air passages are blocked and sounds like loud snoring.

166.     Upon information and belief, Defendant Roman was still in the intake area outside the intake cell when Mr. Lopez began stridor breathing. Defendant Roman took no notice of Mr. Lopez's beleaguered breaths and took no steps to initiate an appropriate medical intervention for Mr. Lopez.

167.     Finally, after hours of being ignored and abused by Defendants, as fully chronicled by the unblinking eye of the video camera, at approximately 9:10 a.m., Mr. Lopez took his last breath and died, shackled and face down in the intake cell. No one noticed.

168.     Despite that he was tasked with constantly monitoring Mr. Lopez, Defendant Roman did not react in any way when Mr. Lopez stopped making the loud noises that accompany stridor breathing. Defendant Roman did nothing when Mr. Lopez's chest stopped rising and falling.

169.    Upon information and belief, Defendant Roman received CPR training through his employment with CDOC.

170.    Upon information and belief, Defendant Roman could have initiated CPR on Mr. Lopez, possibly saving his life.

171.    Defendant Neumeister finally arrived at SCCF at approximately 9:15 a.m. on March 17, 2013. Defendant Neumeister lives approximately fifteen minutes from SCCF, yet it took her almost an hour and a half to get to the facility after speaking to Defendant Yates.

172.    Upon Defendant Neumeister's arrival at SCCF, Mr. Lopez's lifeless body, in full restraints, was still on the floor of the intake cell. Mr. Lopez's arms were folded so that his hands, cuffed, fell under his torso, and his head was facing slightly to the right, just slightly visible from the intake cell door.

173.    When Defendant Neumeister arrived at SCCF, she opened the food tray slot of the intake cell door and yelled, "What are ya doing? What is going on and why are acting this way? Don't ya like it on 3 Right?" Defendant Roman corrected Defendant Neumeister, telling her that Mr. Lopez was actually being housed on 4 Right.

174.    Mr. Lopez, who had been dead for approximately five minutes, did not respond. Hearing no response, Defendant Neumeister inexplicably said to Mr. Lopez's corpse: "I can see you breathing."

175.    At this point, it was clear that Mr. Lopez's chest was not rising or falling. He was not taking any breaths.

176.    In a moment of great insight, Defendant Roman then told Defendant Neumeister that Mr. Lopez had been "breathing earlier" (probably for most of his life) and that his breathing

had been "raspy" all morning. Neither Defendant Roman nor Defendant Neumeister commented on the fact that Mr. Lopez had clearly stopped breathing.

177.    Defendant Neumeister then continued her conversation with Mr. Lopez's corpse: "Open your eyes."  She then inexplicably said "Thanks" to the deceased Mr. Lopez.

178.    Mr. Lopez was dead and could not open his eyes. Defendant Neumeister was clearly attempting to put on a show for the video camera. Any reasonable person observing Mr. Lopez would have known that he wasn't breathing and needed medical assistance. Instead, Defendant Neumeister laughed and said to Defendant Roman, "Well, I don't know. Isn't that terrible?"

179.    Defendant Neumeister then told Defendant Yates that the lifeless Mr. Lopez "was not doing anything to warrant" mental health intervention, stating that she didn't "see any need to do anything for him mental health wise."

180.    Defendant Neumeister then left the intake cell door and began laughing and conversing with Defendants Yates and Roman in the intake area. For several minutes, Defendants Yates, Roman, and Neumeister joked with one another while Mr. Lopez lay dead a few feet away. Defendant Neumeister spent more time joking with Defendants Yates and Roman than she did examining Mr. Lopez.

181.    Contrary to CDOC policy, Defendant Neumeister never reviewed Mr. Lopez's medical records or mental health history, nor did she truly examine Mr. Lopez in any way on March 17, 2013.

182.     On information and belief, Defendants Neumeister, Yates, and Roman were all trained in CPR as part of their employment with CDOC, yet each of them failed to take any meaningful steps to save Mr. Lopez's life.

183.     After nonchalantly chatting with Defendants Roman and Yates for several minutes, Defendant Neumeister left the intake area. Defendants Roman and Yates did nothing further to check on Mr. Lopez's well-being.

184.     Approximately twenty minutes after Mr. Lopez took his last breath, Defendants Roman, Urban, and Wilkins entered the intake cell to transport Mr. Lopez back to his cell. When Defendants Roman, Urban, and Wilkins first entered the cell, none of them commented that Mr. Lopez was not breathing.

185.     Instead, Defendants Roman, Urban, and Wilkins used "strength" techniques to lift Mr. Lopez's lifeless body off the floor, to drag him into the hallway, and to place his corpse in the restraint chair. It was only then that Defendants Roman, Urban, and Wilkins explicitly recognized that Mr. Lopez was not breathing. Defendants Roman, Urban, and Wilkins then, finally, called for medical back-up, but it was too late. Mr. Lopez was dead.

**CDOC's Investigation into Mr. Lopez's Death**

186.     After Mr. Lopez died, no one from DOC bothered to call Ms. Juanita Lopez, who was Christopher Lopez's mother.  Instead Defendant Jaramillo contacted his former mother-in-law, Vi Rios, despite that CDOC had updated Mr. Lopez's emergency contact as his mother, Plaintiff Juanita Lopez, on July 13, 2011.

187.    Once Plaintiff Lopez learned from her son's former mother in law that her son had died, she made multiple inquiries to CDOC staff as to the cause of her son's death and the circumstances surrounding his final hours. Time and again, CDOC officials refused to provide Plaintiff Lopez any information. CDOC officials did not want the Lopez family, or the public, to learn of the horrific circumstances surrounding Mr. Lopez's death and they engaged in a cover up of the facts and circumstances surrounding these events.

188.    Meanwhile, CDOC officials were conducting an internal investigation. On March 17, 2013, after Mr. Lopez died, Defendant Yates contacted James Montoya, an investigator with the CDOC Inspector General's office.

189.    According to CDOC policy, the IG investigator assigned to investigate a prisoner's death is responsible for communicating with all other appropriate law enforcement agencies as necessary.

190.    After investigating the circumstances surrounding Mr. Lopez's death, Investigator Montoya concluded that "[t]here [was] probable cause to believe that no efforts to safeguard the health, welfare and safety of [Mr.] Lopez were undertaken during the time he was placed in an isolated intake area cell subsequent to his medical emergency."

191.    Upon information and belief, despite the conclusions reached in his investigation, Investigator Montoya failed to share the results of this investigation, or even the fact of Mr. Lopez's death, with the Tenth Judicial District Attorney's Office. Therefore, no criminal prosecutions were ever considered. Despite the legal duty of the IG to report evidence of criminal activity, no report of this criminally negligent homicide was ever forwarded to any law enforcement office for review and for action.  The first time the elected district attorney in

Pueblo ever heard about the Lopez death was in June of 2014 when undersigned counsel
informed him of this matter.

192.    An autopsy revealed that Mr. Lopez died of severe hyponatremia, a condition that
occurs when the level of sodium in a person's blood is abnormally low.

193.    Upon information and belief, too much psychotropic medication in a person's
bloodstream can lead to hyponatremia.

194.    Upon information and belief, almost all instances of hyponatremia are treatable if
a person receives prompt and adequate medical attention.

195.    At the behest of then-Executive Director Tom Clements, Defendant Wasko also
conducted a review of the circumstances surrounding Mr. Lopez's death concurrently with the
Inspector General's investigation.

196.    After Mr. Clements death on March 18, 2013, then-Interim Executive Director of
CDOC, Tony Carochi, delegated to Defendant Wasko the task of conducting the predisciplinary
process for all staff involved in Mr. Lopez's death.

197.    Upon review of the circumstances surrounding Mr. Lopez's death, Defendant
Wasko terminated Defendants Rose, Villers, and Neumeister for their role in Mr. Lopez's death.

198.    During her investigation into Defendant Neumeister's role in Mr. Lopez's death,
Defendant Wasko met with Defendant Neumeister on April 16, 2013. During that meeting,
Defendant Neumeister said to Defendant Wasko that she knew of two things she should have
done differently on March 17, 2013. The first was get to SCCF quicker after Defendant Yates
called Defendant Neumeister. The second was to call "medical back up as soon as I didn't seen

him breathing." Defendant Neumeister said, "Two things. And I could maybe have saved his

life."

      199.     The following conversation ensued between Defendant Wasko and Defendant

Neumeister:

> Defendant Wasko: "So you're telling me, Cheryl, that you did not see him
> breathing?"
> Defendant Neumeister: "Yes, I'm telling you that. I could not see any rise or fall, I
> couldn't see any of that, and that's when I became concerned, and that's when I
> instructed him further, you know, to do something. And what I saw him do, and I
> stick by this, is that I – his right eye barely opened, and he took that weird breath,
> you know, deep, loud breath. I saw those two things happen."
> …
> Defendant Neumeister: I did have that gut feeling that I needed to get somebody in
> there, and I don't know why I didn't follow up on it. I have no idea.
> …
> Defendant Wasko: "I think we can agree a mental health assessment was not
> conducted."
> Defendant Neumeister: "Correct."

      200.     In deciding to terminate Defendant Neumeister, Defendant Wasko determined

that her actions were willful and egregious and that she violated the CDOC Code of Conduct in

the following ways: failing to treat Mr. Lopez professionally, failing to perform effectively and

efficiently, casting doubt on her integrity and exercising poor judgment, willfully departing from

the truth about the events of March 17, 2013 in her documentation of the mental health

assessment, and bringing disrepute and discredit upon CDOC.

      201.     Upon information and belief, Defendant Wasko did not terminate any other staff,

despite obvious evidence that Defendants Aring, Carlino, Doxtater, Gonzalez, Hasui, Jaramillo,

Munsell, Roman, Sisnroy, Urban, Wilkins, Woltz, and Yates also egregiously and willfully failed

to ensure that Mr. Lopez was provided necessary medical assistance, failed to treat Mr. Lopez

professionally, failed to perform effectively and efficiently, and bringing disrepute and discredit upon CDOC.

202.    Further, Defendants Zupan and Lind failed to adequately train or supervise their staff to respond to the obvious serious medical needs of inmates.  They further failed take any remedial action despite their duties as warden and associate warden, respectively, to ensure that prisoners confined in their custody are kept safe and provided adequate medical care.  At least sixteen staff members ignored Mr. Lopez's obvious serious medical needs and they obviously lacked any training or supervision in responding to medical situations like those confronting Mr. Lopez.

203.    As warden and associate warden of SCCF, Defendants Zupan and Lind were responsible for training and supervising all SCCF staff members in how to identify a medical crisis and appropriately respond to it.

204.    In the final hours of his life, Mr. Lopez encountered, at a minimum, sixteen SCCF staff members. Not a single staff member took any steps to initiate appropriate medical intervention that would have saved Mr. Lopez's life. Defendants Zupan and Lind failed to train and supervise SCCF staff members to recognize obvious, serious medical needs and to ensure that prisoners in SCCF custody received adequate medical attention.

205.    Upon information and belief, neither Defendant Zupan nor Lind terminated or otherwise disciplined Defendants Aring, Carlino, Doxtater, Gonzalez, Hasui, Jaramillo, Munsell, Roman, Sisnroy, Urban, Wilkins, Woltz, and Yates for their role in Mr. Lopez's death.

206.    Defendants Wasko, Zupan, and Lind refused to provide Plaintiff Lopez with any

information regarding her son's unexpected and untimely death in the custody of the Colorado

Department of Corrections.

207.    Defendants Wasko, Zupan, and Lind continued to cover up this egregious

violation of human rights by failing to take the report from the Inspector General and forward it

to appropriate prosecutorial authorities for immediate action in an effort to deny Plaintiffs access

to the court.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(§1983 – Eighth Amendment Violation - Failure to Provide Medical Care and Treatment)**
**(Against Defendants Yates, Jaramillo, Hasui, Aring, Carlino, Doxtater, Gonzalez, Munsell,**
**Urban, Wilkins, Woltz, Neumeister, Roman, Rose, Sisnroy, and Villers in their Official and**
**Individual Capacities)**

208.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

209.    At all times relevant to the allegations in this Complaint, Defendants acted or

failed to act under color of state law.

210.    Defendants are persons under 42 U.S.C. § 1983.

211.    At all times relevant to the allegations in this Complaint, Defendants knew or

should have known of Mr. Lopez's life-threatening medical condition.

212.    Nevertheless, with deliberate indifference to Mr. Lopez's constitutional right not

to be denied necessary medical care, protected the Eighth Amendment to the United States

Constitution, Defendants failed to examine, treat and care for Mr. Lopez's worsening condition

and failed to send Mr. Lopez for treatment. They did so despite their knowledge of Mr. Lopez's

serious medical needs, placing him at risk of substantial physical harm.

213.    When Mr. Lopez was obviously unable to respond to Defendants inquiries and

unable to hold himself up, Defendants acted with deliberate indifference to Mr. Lopez's

obviously serious medical need and constitutional rights in failing to obtain and provide medical

treatment for him in a timely and appropriate fashion.

214.    The acts or omissions of all Defendants were conducted within the scope of their

official duties and employment.

215.    The acts or omissions of all Defendants were the legal and proximate cause of Mr.

Lopez's injuries and death.

216.    The acts or omissions of each Defendant caused Mr. Lopez damages in that he

suffered extreme physical and mental pain during the approximately six hours leading up to his

death, and ultimately cause Mr. Lopez's death.

217.    The actions or inactions of Defendants as described herein intentionally deprived

Mr. Lopez of his right to be free of cruel and unusual punishment and of rights, privileges,

liberties, and immunities secured by the Constitution of the United States of America, and caused

him other damages.

**SECOND CLAIM FOR RELIEF**
**(§1983 – Eighth Amendment Violation - Supervisory Liability for**
**Failure to Train and Supervise)**
**(Against Defendants Wasko, Zupan, and Lind (referred to collectively herein as**
**"Supervisory Defendants"))**

218.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

219.    The Supervisory Defendants each have duties to train and supervise correctional officers, medical staff, and mental health staff in order to ensure the safety and well-being of prisoners confined at San Carlos Correctional Facility.

220.    Each of the Supervisory Defendants failed to discharge these duties.

221.    The Supervisory Defendants acted intentionally in failing to adequately train and supervise correctional officers, medical staff, and mental health staff.

222.    The Supervisory Defendants were responsible for the creation of the special controls policy and the custom of using the special controls status to punish prisoners for behavior not related to the policy.

223.    The Supervisory Defendants' failure to properly train and supervise their subordinate employees was a moving force and proximate cause of the violation of Mr. Lopez's constitutional rights.

224.    The Supervisory Defendants' implementation of the special controls policy in a way that allowed correctional officers, medical staff, and mental health staff to use special controls to punish prisoners for exhibiting behaviors related to their mental illness was a moving force and proximate cause of the violation of Mr. Lopez's constitutional rights.

225.    The Supervisory Defendants' implementation of the special controls policy in a way that allowed correctional officers, medical staff, and mental health staff to use special controls to punish prisoners who were not exhibiting violent or disruptive behavior was a moving force and proximate cause of the violation of Mr. Lopez's constitutional rights.

226.     The acts or omissions of the Supervisory Defendants caused Mr. Lopez damage in

that he suffered from extreme physical and mental pain during the approximately six hours

leading up to his death and ultimately caused his death.

227.     The actions and inactions of the Supervisory Defendants as described herein

deprived Mr. Lopez of the rights, privileges, liberties, and immunities secured by the

Constitution of the United States of America, and caused him other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their

favor and against Defendants, and grant:

(a)     Appropriate relief at law and equity;

(b)     Declaratory relief and other appropriate equitable relief;

(c)     Economic losses on all claims allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional

distress, humiliation, loss of enjoyment of life, and other pain and suffering on all

claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

(f)     Attorneys' fees and the costs associated with this action, including expert witness

fees, on all claims allowed by law;

(g)     Pre- and post-judgment interest at the highest lawful rate;

(h)     Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated this 19th day of June, 2014.

KILLMER, LANE & NEWMAN, LLP

_s/ David A. Lane_____
David A. Lane
Nicole B. Godfrey
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
ngodfrey@kln-law.com

ATTORNEYS FOR PLAINTIFF